**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **QUINN BASS, surviving son, individually,** )<br>**and as plaintiff Ad Litem on behalf of** )<br>**decedent Lawrence C. Bass Jr.,** )<br>**LATOYA GARCIA, surviving daughter,** )<br>**and surviving minor daughters M.B. and T.B.,** )<br>**through their Natural Mother and Next Friend,** )<br>**PHYNICE KELLEY,** )<br>**of Lawrence C. Bass Jr., deceased,** )<br> )<br>             **Plaintiffs,** )<br>**v.** )<br> )<br>**UNITED STATES OF AMERICA,** )<br>**Serve:** )<br>Timothy Garrison )<br>U.S. Attorney for the Western District of Missouri )<br>Attn.: Civil Process Clerk )<br>400 E 9th St., Room 5510 )<br>Kansas City, MO 64106 )<br> )<br>**and** )<br> )<br>William Barr )<br>Attorney General of the United States )<br>U.S. Dept. of Justice )<br>950 Pennsylvania Ave., NW )<br>Washington, DC 20530 )<br> )<br>            **Defendant.** ) | **Case No.** |

**COMPLAINT FOR WRONGFUL DEATH PURSUANT TO § 537.080 AND THE
FEDERAL TORT CLAIMS ACT 28 U.S.C. §1346(b), §1402(b), §2401(b), and §2671-2680**

COME NOW Plaintiffs, by and through their counsel of record, and for their causes of

action state and aver as follows:

## JURISDICITON

1.  This action for the wrongful death of Lawrence C. Bass, Jr., is brought pursuant to §

    537.080 R.S.Mo. (2016) and 28 U.S.C. §1346(b), §1402(b), §2401(b), and§2671-2680.

1

2. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1346(b) as the United States is a defendant in this civil action for money damages caused by the negligent acts of any employee of the government while acting within the scope of employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

## VENUE

3. Venue is proper pursuant to 32 C.F.R. § 750.32 as the Lake City Army Ammunition Plant is located in this district, and that is where the wrong complained of was committed. In addition, all plaintiffs reside in the Western District of Missouri.

## PARTIES

4. Quinn Bass is the adult surviving son, of Lawrence C. Bass and is in the first class of beneficiaries listed in § 537.080 R.S.Mo. (2016). Quinn Bass has moved contemporaneously for appointment as Plaintiff Ad Litem on behalf of decedent, Lawrence C. Bass Jr.

5. LaToya Garcia, is the adult surviving daughter, of Lawrence C. Bass and is in the first class of beneficiaries listed in § 537.080 R.S.Mo. (2016).

6. Phynice Kelley, has moved contemporaneously for appointment as Next Friend for minors M.B., surviving daughter, and T.B., surviving daughter of Lawrence C. Bass Jr., deceased. These minor children are also in the first class of beneficiaries listed in § 537.080 R.S.Mo. (2016).

7. At the time of the negligent acts and occurrences complained of herein and at all times mentioned, Defendant United States of America, through the Department of the Army,

owns and operates the Lake City Army Ammunition Plant ("LCAAP") located at 25201 East State Route 78, Independence, Missouri 64056.

## CONDITIONS PRECEDENT

8. Plaintiffs have complied with the conditions precedent for filing a lawsuit under the Federal Tort Claims Act in that they filed an administrative claim, Standard Form 95 on or about October 9, 2018 with the following federal agencies:

   a. Fort Leavenworth Army Claims Office

   b. U.S. Army Claims Service, ATTN: JACS-TCO

   c. Lake City Army Ammunition Plant

   d. AMSAS-GC, US Army/Army Sustainment Command

9. As of the date of this filing the claim has not been resolved.

## THE APRIL 11, 2017 EXPLOSION

10. On Tuesday, April 11, 2017, at approximately 12:57 p.m., an explosion occurred at the Lake City Army Ammunition Plant ("LCAAP") located at 25201 East State Route 78, Independence, Missouri 64056 in building #85.

11. The LCAAP is a United States Army Installation. It is the only facility that manufactures all of the small arms ammunition for the U.S. Military.

12. Lawrence Bass, plaintiffs' decedent, was working in building #85, Bay #901. Mr. Bass had an excellent reputation at the LCAAP for safety and efficiency; he often did the safety training for new employees. He was in Bay 901 when the explosion occurred.

13. Mr. Bass was in the process of making Tetrazene at the time of the explosion.

14. Tetrazene is a component of a primer, the small round metal disc in the middle of a centerfire cartridge. The primer is the part of a cartridge that is struck by the firing pin,

3

that force causing compression of the chemicals inside and ultimately detonation of the powder charge in the cartridge. Primers have been made at LCAAP since it was founded.

15. Tetrazene (GNGT) is classified as an initiating explosive. It can be used in detonators when initiated by another primary explosive or in a mixture with another primary explosive; Addition of small amounts of Tetrazene to other explosives dramatically increases the sensitivity to mechanical stimuli. Tetrazene often acts as an energetic sensitizer in many compositions - particularly in primers and various fuse mixtures. It is used in applications where high sensitivity to friction, impact, stab, flame, and spark is demanded. In other words, because it works synergistically with other primary explosives and increases their sensitivity to being struck, it improves the performance of other compounds used in primers. The content of Tetrazene in explosive mixtures generally does not exceed 10%.

16. Tetrazene detonates more easily when uncompressed and undergoes "gradual dead-pressing" when subjected to higher compacting pressures (in other words, if it is very slowly compressed it loses some of its explosive power). Tetrazene also shows a variation in the "order of detonation" depending on the method of initiation. This is reflected in a lower brisance (the shattering capability of a high explosive) when initiated by flame or small amounts of other primary explosives, and a higher brisance when initiated by the severe shock of a large priming charge. A wide range of detonation parameters is therefore obtainable for Tetrazene by varying the compacting pressure and the type of initiation.

17. Tetrazine is made by reacting sodium nitrite with an aminoguanidine salt dissolved in acetic acid at 30–40 °C.

18. Once the compound is made it must be dried.  However, drying must be done in a very highly controlled environment for several reasons.

19. First among these is the susceptibility of the compound to static electric discharge (static electricity with spark).  The environment and protective gear employed by the decedent were employed specifically to reduce the chance of such a spark.  In addition, moisture sensors activate water misting equipment if the environment becomes too dry.

20. The second reason is that the compound itself must be at the right moisture content, defined internally as between 12% and 20 %.  Plant employees familiar with the compound know that "all Tetrazene needs is one crystal to not be at the right moisture content for it to explode."  Once the compound has been formulated it is vacuumed. Once the vacuuming process is complete, and the mixture is dried to the proper moisture level, which can take anywhere between two (2) to three (3) hours.  Once the drying has occurred employees reenter the room and turn off the vacuum system.  Then they take a sample of the material, near the middle of the product, using an anti-static spatula.

21. The spatula is made internally and is not in the Standard Operating Procedure ("SOP").

22. After the sample is taken, it is submitted to the lab to test the moisture content.

23. Then, after placing the sample into the lab cart, which was located outside the bay, employees use the spatula to further break up the remaining product and then pull the cloth from the sides to loosen the material.

24. Once the material is loosened, employees then pull the cloth out and put the product into a metal mixing bowl located inside the room. Once in the bowl, it is ready to be scooped and placed into cups. The cups are then placed on the table to be wiped off, placed into a carrier and moved to another part of the facility.

5

25. Supervisors at the plant confirmed that workers were allowed to use a non-conductive plastic spatula to turn, scoop or scrape the finished product during the manufacture of Tetrazene.

26. There were three batches prepared on April 11, 2017. Batches A and B were finished. Mr. Bass and a co-worker had vacuumed and packaged Batch B earlier in the day.

27. After completing Batch B, Mr. Bass began the vacuuming process for Batch C. Upon completion of the vacuuming process, Mr. Bass would have obtained a sample from the batch for submission to the laboratory to confirm that the moisture content was within the acceptable range. Mr. Bass then removed the Tetrazene from the filter cloth and placed it inside of an aluminum bowl to begin cupping the Tetrazene. It was at this stage that the explosion occurred.

28. In the video Mr. Bass is seen performing a "wedging" operation with the spatula the instant before the compound exploded, killing him.

29. Mr. Bass' supervisors acknowledged that they had reviewed the video footage of the incident and stated that they did not observe any safety violations or deviations from the Standard Operating Procedures on the video footage.

**THE ATF INSPECTION AND REPORT**

30. The Bureau of Alcohol Tobacco and Firearms conducted an on-site review and investigation into the incident.

31. In their review they examined three hypotheses under the scientific method and was able to exclude only one of them. The cause excluded was a purposeful or intentional detonation by Mr. Bass. The report concluded "Investigators were unable to identify any data that BASS intended to cause the explosion. Examination of the video surveillance

footage did not reveal any abnormal behavior or movements by BASS as he worked in Bay #901."

32. The second hypothesis ATF considered was that Lawrence Bass introduced an electrostatic discharge as he manipulated the Tetrazine, subsequently causing an explosion.

33. Although not able to definitively rule it out, the ATF concluded that Hypothesis #2 was feasible but "cannot be declared probable or conclusive."

34. The ATF's third hypothesis was that the explosion occurred from friction, impact, or stab by Mr. Bass as he manipulated the explosive material using an anti-static plastic hand spatula.

35. Prior to the explosion, Mr. Bass was observed on video surveillance footage manipulating the Tetrazene using an "institutional" technique referred to by his coworkers as "Wedging".   Investigators pointed out that "It should be noted that "Wedging" was not in the Orbital ATK SOP #85A-11-2, as an approved method for manipulating Tetrazene during the manufacturing process."

36. The ATF further concluded "At the time of the explosion, Mr. Bass' right hand was observed inserting a hardened antistatic hand tool into the product as the explosion was initiated. As previously mentioned, Tetrazene is highly sensitive to friction, impact, or stab."

37. They concluded: "Investigators were unable to eliminate Hypothesis #3 as a cause of the explosion. The cause of the explosion would be classified as accidental if this hypothesis was the only one not to be disproven."

7

38. In short, while the exact cause of the Tetrazine explosion could be either friction or static discharge, in both instances it is directly related to the use of an institutional tool not approved in the Standard Operating Procedure or in a Letter of Instruction.

39. No matter which of the two hypotheses are correct, by any measure the explosion was horrific for Mr. Bass.

40. The ATF reported that "Human remains were also observed on the outside of the structure within the debris field …" and that "a biohazard risk existed after observing the distribution of human remains …"

41. The ATF found that "[u]pon entering the debris field, what remained of the upper torso of the deceased victim was located in vegetation on the Western side of a draining ditch on the eastern side of Building #85 (lower level). The upper torso was oriented directly in line with what remained of the victim's lower torso and legs which were observed on the ground just outside of Bay #90 l along the edge of the exterior wall. The victim's feet were located toward Building #85. and more specifically Bay #901."

42. The ATF also noted that "[a]fter the upper torso was documented, marked, and recovered, the recovery team proceeded toward Bay #901 and recovered what appeared to be the remains of the victim's arm. The remains were documented, marked and then recovered."

43. ATF Investigators then "proceeded toward the edge of Building #85, near the Southeast comer of Bay #901, where the victim's lower torso and legs were observed. The remains were documented, marked, and then recovered."

44. In short, the force of the explosion blew Mr. Bass apart, leaving his remains scattered over a large area.

## GOVERNMENT CONTROL AND RESPONSIBILITY FOR THE LAKE ARMY AMMUNITION PLANT

45. Lake City Army Ammunition Plant (LCAAP) is a 3,935-acre U.S. government-owned, contractor-operated facility in northeastern Independence, Missouri, that manufactures and tests small caliber ammunition for the U.S. Army.   It is considered a Federal Enclave.

46. LCAAP is the single largest producer of small arms ammunition for the United States Armed Forces.

47. LCAAP operates under DoD Manual 4145.26, March 13, 2008 which sets out the safety requirements for the facility.  It is under the direct supervision of the Under Secretary of Defense for Acquisition and Sustainment.

48. Operational supervisory authority is held by a Lieutenant Colonel assigned to AMSAS-GC, US Army Sustainment Command.  The Command is located at Ft. Meade, Maryland, while the on-site commander is located at the Lake City Army Ammunition Plant.

49. According to the Joint Munitions Command, LCAAP is commanded by Lt. Col. Dana Crow.  Lake City has a government staff of 27 Department of the Army civilians and one Soldier to provide contract oversight. The government staff has a payroll budget of $2.9 million.

50. Although operated by a contractor, Department of Defense and the Joint Munitions Command retain operational oversight of the facility.

51. The Department of Defense ("DOD") and U.S. Army retained day-to-day control of the work performed by its contractors at LCAAP.

52. DoD Manual 4145.26, March 13, 2008 establishes a number of mandatory requirements for the contractors operating Army Ammunition plants. Among those are:

    a. C1.3. MANDATORY REQUIREMENTS AND ADVISORY GUIDANCE. This Manual uses the term "shall" or an affirmative statement to indicate mandatory requirements. The terms "should" and "may" are advisory in nature.

    b. C1.4. COMPLIANCE WITH MANDATORY REQUIREMENTS. The Department of Defense requires compliance with mandatory provisions of this Manual and applicable portions of Reference (c).

    c. C1.4.1.2. In the post-award phase, the contractor has 30 days from the date of notification by the ACO to correct the non-compliant condition and inform the ACO of the corrective actions taken. The contracting officer may direct a different time period for the correction of any noncompliance. If the contractor refuses or fails to correct any noncompliance within the time period specified by the ACO, the Government has the right to direct the contractor to cease performance on all or part of affected contracts.

    d. C1.5.1. The PCO will request a DoD pre-award safety survey to help determine contractor capability. DoD safety personnel conduct pre-award surveys to evaluate each prospective contractor's ability to comply with contract safety requirements.

    e. C1.7. POST-AWARD CONTRACTOR RESPONSIBILITIES. The contractor shall:

    f. C1.7.5. Provide access to facilities and safety program documentation to DoD safety representatives.

g.  C2.3. ACCIDENT INVESTIGATION REQUIREMENTS. The contractor is contractually responsible for investigating and reporting AE accidents; however, the Government retains the right to conduct an independent DoD investigation when circumstances warrant.

h.  C3.3. SOPs. Clearly written procedures are essential to avoid operator errors and ensure process control. Therefore, before starting operations involving AE [Ammunition and Explosives], qualified personnel shall develop, review, and approve written procedures.

i.  C3.3.6. Revalidation. The managing authority shall ensure that qualified personnel review and update SOPs as often as necessary to reflect improved methods, equipment substitutions, facility modifications, or process changes.

j.  C3.9. SAFETY HAND-TOOLS

k.  C3.9.1. Unless a hazard analysis indicates otherwise, only hand tools constructed of wood or non-sparking metals such as bronze, lead, and "K" Monel shall be used for work in locations and on equipment that contain exposed explosives or hazardous concentrations of flammable dusts, gases, or vapors that are susceptible to mechanical spark.

53. As the manual lays out the DOD through the Joint Munitions Command's twenty-eight civilians and one commissioned officer assigned carry out oversight duties primarily oriented toward safety.

54. The contractor is required to give DOD access to the facility and its safety program specifically for the purpose of oversight.

55. The "managing authority" (the Joint Munitions Command) is mandated to ensure that qualified personnel review and update SOPs as often as necessary.

56. The requirement for wooden non-sparking tools is also phrased in mandatory language.

57. While day to day operations involving production are handled by the facility operator, oversight responsibilities, including oversight for safety and protection of government assets and personnel has always remained with the United States Army and Department of Defense.

58. On information and belief, and based in part on the above regulatory cite, DOD/US Army is responsible for auditing compliance with safety policies and safety procedures.

59. On information and belief, and based in part on the above regulatory cite, DOD/US Army is responsible to ensure that the contractor has appropriate tools, reagents, and protocols to safely manufacture explosives.

60. On information and belief, and based in part on the above regulatory cite, DOD/US Army discharges its responsibilities through the actions of the 28 civilian and one military individual assigned to the LCAAP.

61. On information and belief, and based in part on the above regulatory cite, DOD/US Army the requirements to exercise oversight for safety are government by regulations and are not discretionary in nature.

62. On information and belief, obtained in part from interviews of current and former LCAAP employees, DOD/US Army personnel do not conduct safety reviews as required by the regulations and had it carried these inspections out and done so in a non-negligent manner, the use of non-standard, unapproved "institutional tools" and "wedging

methods" not in the SOP would have been identified and terminated before any explosion took place.

63. On information and belief, obtained in part from interviews of current and former LCAAP employees, DOD/US Army personnel do not maintain appropriate records of their oversight.

64. The explosion on April 11, 2017 caused more than $1,000,000 worth of property damage at LCAAP.

65. The manufacture of explosives is an ultra-hazardous activity.

66. The explosives manufactured at LCAAP are made with chemicals and compounds that when exposed to spark, electrostatic discharge, friction, or stabbing, will detonate with explosive effects.

67. The nature of the activity is the creation of devices designed to render fatal injuries.

68. These activities are carried out in widely distributed buildings with different forms of shielding so as to minimize the effects of explosions in these distributed buildings.

69. Manufacturing explosive chemicals and compounds creates a peculiar risk of harm directly from explosion and fire.

70. The Army and Department of Defense regulations and manuals, when read together, demonstrate that the Army and Department of Defense reasonably considered the possibility that contractors engaged in this activity would act in a negligent manner as their policies are designed to minimize the risk to people and equipment.

71. The US Army and DOD had reason to know, and should have known, that Orbital ATK was incompetent based on evidence in the public record.

72. *Knurr v. Orbital ATK*, 272 F.Supp.3d 784, (E.D. Va. 2017) was filed in the Eastern District of Virginia in 2016 as a securities class action. Facts set out in that case were sufficient to put the government on notice that it needed to watch Orbital ATK more closely due to their promise to investors to cut staff and expenses. This because the complaint there alleged:

    a. Alliant originally entered into in 2000.

    b. Alliant manufactured billions of rounds of small caliber ammunition under this contract and the contract accounted for 13% of Alliant's total revenues in fiscal year 2010; no other contract contributed more than 10% of the company's sales.

    c. In fiscal year 2010, Alliant received a four-year renewal on the Lake City Contract. In August 2012, Alliant submitted a bid to the Army to retain the Lake City Contract beyond 2013.

    d. The Knurr Complaint alleges that Alliant, at this time, was under pressure to retain the Lake City Contract because Alliant had recently lost a bid to renew another major multi-year ammunition Army contract to Alliant's competitor, BAE Systems PLC.

    e. To make matters worse for Alliant, BAE Systems was also seeking the Lake City Contract.

    f. Alliant "aggressively bid" on the Lake City Contract renewal with a "low-ball bid," and won the renewal of the Lake City Contract on September 28, 2012; the contract had a seven-year term with a three-year extension option, and production under the contract would begin on October 1, 2013.

g.   On various conference calls, Alliant acknowledged that it won the Lake City Contract on an "aggressive bid" and that winning that bid would require "price reductions which could impact margins in the early years of winning the recompete."

h.   After Alliant won the contract, management reiterated that it was an "aggressive contract" and that the company would experience an "initial period of margin pressure" and "some reduced revenue" as a result.

i.   Management also informed investors on October 30, 2014 that Alliant was taking a number of steps to reduce costs and boost profitability on the Lake City Contract, including (i) reducing staff and work force; and (ii) offering commercial ammunition out of the Lake City Plant.

j.   These reductions in staff and work force created pressure on employees to work more quickly and go outside the SOP with procedure.

73. As a result of the securities class action DOD and the US Army knew or should have known that Orbital ATK was working on a very thin budget and that it would take steps to increase its margin by increasing volume while reducing staff, a combination certain to create safety issues.

## COUNT I
## NEGLIGENCE

74. Plaintiffs restate, replead and incorporate by reference paragraphs 1 – 73 as if fully set forth herein.

75. On or before April 11, 2017, the US Army, through the actions or inactions of its civilian and military employees, failed to adequately discharge their non-discretionary duties of oversight over its contractor Orbital ATK (now Northrup Grumman).

76. Defendant United States of America failed to develop, review, and approve and implement complete operating procedures that provide clear instructions for safely conducting activities related to the process of making Tetrazene to ensure that all techniques and equipment were safe and appropriate.

77. Contractors were permitted to use techniques and equipment that were not part of the SOP.

78. Additionally, the SOP and Process Hazard Analysis ("PHA") did not adequately consider or monitor the moisture content and/or humidity level of the Tetrazene during the manufacturing process. There was a failure to develop and include safe operating limits, the consequences of deviation from those limits and the steps required to correct or avoid those deviations. Some examples of the safe limits might include, but are not limited to, the safe handling moisture ranges for Tetrazene, humidity levels for the manufacturing bay, and movement rates for Tetrazene (safe handling speeds).

79. The US Army was negligent in the following:

    a. Failing to have adequate safety measures in place regarding proper usage of the CompuServe Moisture Analyzer.

    b. Failing to properly and safely utilize the CompuServe Moisture Analyzer.

    c. Failing to ensure or have policies and procedures in place regarding obtaining timely and accurate analysis results from the lab regarding Tetrazene moisture levels.

    d. Failing to protect Lawrence Bass from the hazard of an explosion by failing to complete a compilation of process safety information for the Tetrazene manufacturing process.

e.  Failing to compile information on the material of construction regarding the subject spatula.

f.  Failing to adequately warn or protect mixers and operators from hazards related to the Tetrazene manufacturing process.

g.  Failing to implement, develop or enforce a proper Process Hazard Analysis ("PHA") regarding transferring Tetrazene or wedging Tetrazene or use of the spatula during the Tetrazene process.

h.  Failing to include all of the manufacturer's safety steps within the Tetrazene Standard Operating Procedure.

i.  Failing to have proper safety policies and procedures regarding the Tetrazene process.

j.  Failing to enforce the Tetrazene Standard Operating Procedure or otherwise confirm that it was being adhered to.

k.  Failing to have proper emergency shut down procedures in the Tetrazene operating procedure.

l.  Failing to outline, provide or specify all safety systems, their use and function within the Tetrazene standard operating procedure.

m.  Failing to enforce or develop adequate Work Center Procedures in place for the manufacture of Tetrazene. These include but are not limited to: procedures prohibiting the use of a spatula or other production aids in the vacuum receiver; procedures prohibiting the "wedging action"; procedures prohibiting the steps to transfer the Tetrazene; removing steps for storing Tetrazene in conductive buckets; requiring operators/mixers to take moisture samples after de-watering

and receive results before handling the Tetrazene; and providing step-by-step instructions regarding how to retrieve moisture samples and utilize the same.

n.   Failing to properly perform sensitivity analysis regarding the Tetrazene process.

o.   Allowing operators/mixers to use tools or production aids during the Tetrazene process that were contrary to safety standards.

p.   Failing to ensure compliance with the Tetrazene Standard Operating Procedure.

q.   Failing to perform a proper and safe Process Hazard Analysis regarding the Tetrazene manufacturing process.

r.   Failing to enforce, implement or develop a proper and safe Standard Operating Procedure regarding the manufacture of Tetrazene, including, but not limited to all steps required for work being performed by high explosive mixers.

s.   Failing to ensure safe moisture levels for Tetrazene during the manufacturing process.

t.   Failing to have policies and procedures in place for the manufacture of Tetrazene that can contain safe operating limits, the consequences of deviating from safe operating limits or the steps to correct or avoid deviations.

u.   Failing to develop and implement written operating procedures that provide clear instruction for safely conducting activities related to the Tetrazene process.

v.   Failing to have an immediate feedback mechanism providing mixers/operators with moisture content.

w.   Failing to properly train and supervise the training of Orbital ATK employees.

x.   Failing to ensure compliance or meet the requirements of 29 CFR 1910.19.

y.   Failing to enforce or develop a safety process related to the use of a spatula and Tetrazene sensitivity at varying moisture levels.

z.   Failing to enforce or develop safe operating procedures regarding the manufacture of Tetrazene to address the impact and friction sensitive nature of Tetrazene.

aa.  Failing to investigate or compile information on friction, impact, sensitivity, or material analysis regarding the construction or use of the spatula with the Tetrazene process.  This includes collecting and storing data and determining the applicability for spatula use.

bb.  Allowing operators/mixers to use a spatula in the Tetrazene process or failing to warn against its use, thus exposing mixers/operators to a detonation hazard.

cc.  Failing to develop or enforce policies, procedures or rules preventing safety issues with impact and friction of Tetrazene which may lead to detonation.

dd.  Allowing long standing use of the spatula in the Tetrazene process when it knew it was contrary to operating procedures.

ee.  Failing to evaluate the wedging process used by operators/mixers during the Tetrazene drying process.

ff.  Failing to develop or enforce steps in the Tetrazene Standard Operating Procedure that address what tools to utilize when obtaining a sample or information regarding how to remove samples of Tetrazene.

gg.  Requiring operators/mixers to use the spatula, an unsafe tool, in the Tetrazene process.

hh.  Failing to provide a safe tool for use in the Tetrazene process.

ii. Failing to determine safe parameters regarding how much force can be used by operators/mixers during the wedging process.

jj. Failing to enforce safe humidity levels inside the subject bay and providing inadequate guidance allowing mixers/operators to determine and monitor the same.

kk. Failing to properly warn or protect operators/mixers in the event the humidity in the subject bay reached a dangerous level.

ll. Allowing the humidity and moisture levels in the subject bay to reach dangerous levels.

mm. Failing to develop proper and safe operating procedures regarding the manufacture of Tetrazene in Safety Manual 4145.

nn. Failing adequately review its contractors' safety procedures, processes, facility and personnel to determine whether it complied with Department of Defense safety requirements in the manufacture of Tetrazene.

oo. Failing to require its contractors' compliance with safety and quality requirements of the DOD contract.

pp. Violating DOD and Army policy directives by failing to comply with specific safety procedures mandated by the Defense department.

qq. Failing to enforce safety standards incorporated in the government's contract with its contractors.

80. As a result of the negligence of the US Army and DOD, Lawrence C. Bass died. He suffered conscious pain and suffering and mental anguish.

81. As a result of the death of Lawrence C. Bass the plaintiffs have suffered damages and will in the future suffer damages including, but not limited to, pecuniary losses, funeral expenses, lost income, lost household services and financial and non-financial support.

82. In addition, the adult children expended money for funeral expenses.

83. Plaintiffs have lost the reasonable value of the decedent's services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support.

WHEREFORE, Plaintiffs seek to recover their damages for the loss of the life of Lawrence C. Bass, for their costs and expenses of this action, and for such other and further relief as this Court deems just.

## COUNT II
## STRICT LIABILITY ULTRAHAZARDOUS ACTIVITY

84. Plaintiffs restate, replead and incorporate by reference paragraphs 1 – 83 as if fully set forth herein.

85. The U.S. government, an employer of an independent contractor who exercises control over any part of the contractor's work is subject to liability to those injured as a result of the contractor's failure to exercise the control with reasonable care.

86. The DOD and U.S. Army, who hired an independent contractor to do extra-dangerous work or ultrahazardous work, had a duty to exercise reasonable care to see that the contractor took proper precautions to protect those who might sustain injury from the work.

87. The US Army and DOD failed to ensure that Orbital ATK had adequate safeguards regarding the manufacture of Tetrazene as set forth above.

88. The failure to identify and interdict the failures above by US Army personnel directly caused or directly contributed to cause the death of Lawrence C. Bass. He suffered conscious pain and suffering and mental anguish.

89. As a result of the death of Lawrence C. Bass the plaintiffs have suffered a loss of direct financial support.

90. In addition, the adult children expended money for funeral expenses.

91. Plaintiffs have lost the reasonable value of the decedent's services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support.

WHEREFORE, Plaintiffs seek to recover their damages for the loss of the life of Lawrence C. Bass, for their costs and expenses of this action, and for such other and further relief as this Court deems just.

## COUNT III
## NEGLIGENT ENTRUSTRMENT

92. Plaintiffs restate, replead and incorporate by reference paragraphs 1 – 91 as if fully set forth herein

93. As set forth above the contractor that the U.S. Army entrusted operation of the LCAAP to, Orbital ATK, was incompetent for the reasons set forth above.

94. As set forth above the US Army and DOD knew or in the exercise of reasonable care should have known that Orbital ATK, the contractor it had entrusted the LCAAP to, was negligent, incompetent, under extreme cost pressure, and otherwise motivated to cut costs at the expense of safety as set forth above.

95. In spite of this knowledge, and even though the Army has procedures to terminate contracts for non-performance or for safety violations, the Army continued to entrust the LCAAP to Orbital ATK.

96. The negligence of Orbital ATK concurred with the negligence of the US Army to cause the explosion that claimed Mr. Bass' life. He suffered conscious pain and suffering and mental anguish.

97. The loss of Mr. Bass caused damages; the plaintiffs have suffered a loss of direct financial support.

98. In addition, the adult children expended money for funeral expenses.

99. Plaintiffs have lost the reasonable value of the decedent's services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support.

WHEREFORE, Plaintiffs seek to recover their damages for the loss of the life of Lawrence C. Bass, for their costs and expenses of this action, and for such other and further relief as this Court deems just.

**Respectfully submitted,**

**BARTIMUS FRICKLETON ROBERTSON RADER, P.C.**

BY:*/s/ Michael C. Rader*
**MICHAEL C. RADER      MO BAR # 49117**
**MICHELLE MARVEL      MO BAR # 59815**
**ANTHONY L. DeWITT      MO BAR # 41612**
**11150 Overbrook Road, Suite 200**
**Leawood, KS 66211**
**(913) 266-2300 (tel)**
**(913) 266-2366 (fax)**

mrader@bflawfirm.com
mmarvel@bflawfirm.com
aldewitt@bflawfirm.com

**ATTORNEYS FOR PLAINTIFFS**